# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 18-231V
Filed: April 28, 2022

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| ERIC P. KAPLAN, | \* | To Be Published |
| | \* | |
| Petitioner, | \* | |
| v. | \* | Ruling on Onset; Finding of Facts; |
| | \* | Influenza ("Flu") Vaccine; |
| SECRETARY OF HEALTH | \* | Transverse Myelitis ("TM") |
| AND HUMAN SERVICES, | \* | |
| | \* | |
| Respondent. | \* | |
| | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Sylvia Chin-Caplan*, Law Office of Sylvia Chin-Caplan, Boston, MA, for petitioner.
*Kyle Pozza, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

### RULING ON ONSET[1]

**Roth**, Special Master:

On February 14, 2018, Dr. Eric Kaplan ("petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 *et seq.*[2] ("Vaccine Act" or "the Program"). Petitioner alleged that he suffered transverse myelitis ("TM") as a result of "the influenza vaccine ("flu") vaccine on October 5, 2015." Petition at 1, ECF No. 1. The parties disagree when petitioner began experiencing neurological decline manifesting as difficulties with left leg/foot functioning. For the reasons set forth below, I find that petitioner's left leg symptoms began prior to his October 5, 2015 flu vaccination and continued with progressive weakness becoming more pronounced just prior to his March 28, 2016 appointment with Dr. Moray.

### I.    PROCEDURAL HISTORY

---

[1] This Ruling has been designated "to be published," which means the undersigned is directing it to be posted on the Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). This Ruling will be available to anyone with access to the internet. However, parties may object to the Ruling's inclusion of certain kinds of confidential information. Under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Ruling will be publicly available. *Id*.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Petitioner filed his claim on February 14, 2018. ECF No. 1. The following day, medical records were filed, Pet. Ex. 11-11, ECF Nos. 4-5, and the matter was assigned to me. ECF No. 6.

Petitioner filed additional medical records and a Statement of Completion on April 16, 2018. Pet. Ex. 12-14, ECF Nos. 9-10.

Following several extensions of time, respondent filed a Status Report on November 13, 2018 requesting a deadline for the filing of his Rule 4 (c) report. ECF Nos. 11, 12, 13, 14, 15, 17. A deadline was set for March 8, 2019 by Non-PDF Order issued February 27, 2019. Respondent filed a Rule 4 (c) Report recommending against entitlement on March 8, 2019. Resp. Rpt., ECF No. 20. Respondent asserted, among other issues not relevant to this ruling on onset, that no contemporaneous medical records support his claim of onset of symptoms. *Id.* at 7. Although petitioner claimed increased weakness in his left leg, alteration in gait, and increased stumbling and tripping approximately one month after his vaccination, he did not seek treatment for another four months. *Id.* "And even then, he made no mention of the onset being in proximity with his vaccination. Not until early 2017 did petitioner begin to provide a history associating the vaccine to the onset of his condition. He has not explained the anomalies." *Id.*

A status conference was held thereafter on May 8, 2019, and an order was issued directing the parties to file a joint status report with potential dates and locations in August of 2019 for an onset hearing. Petitioner was additionally ordered to file MRI reports and all updated medical records by July 8, 2019. ECF No. 21.

On May 15, 2019, the parties filed a joint status report and petitioner's Onset Hearing was set for August 6, 2019, in Boston, Massachusetts. ECF No. 24. Prior to the hearing, additional medical records were filed. Pet. Ex. 16-18, ECF Nos. 23, 28. A pre-hearing status conference was held on July 26, 2019 and the Onset Hearing was held on August 6, 2019. *See* ECF No. 31-32.

Following the Onset Hearing, an order was issued for petitioner to file his VAERS reports, a personal file he claimed he maintained, and a status report on whether Dr. Moray would be produced for testimony to explain the significant inconsistences between his medical records and a February 2, 2017 letter he authored. ECF No. 30. Petitioner filed a status report on September 6, 2019, advising that Dr. Moray was willing to provide testimony. ECF No. 33. Additional records were filed on September 16, 2019 and October 2, 2019. Pet. Ex. 19-20, ECF Nos. 35, 37.

A supplemental onset hearing was set for January 29, 2020, for the testimony of Dr. Moray. ECF No 40. A pre-hearing status conference was held on January 27, 2020, and the hearing was held two days later. ECF Nos. 41, 44.

Following Dr. Moray's testimony, petitioner was ordered to file a status report detailing specifics associated with Dr. Moray's letter of February 2, 2017, which included who requested it and to whom it was sent. ECF No. 42. Petitioner filed a status report on March 16, 2020 confirming that petitioner verbally requested the letter in a telephone message to Dr. Moray's office. ECF No. 45. Petitioner then filed a second status report clarifying that petitioner left a message requesting to speak to Dr. Moray and requested the letter during a telephone conversation with Dr. Moray.

ECF No. 47. Along with the status report, petitioner filed the telephone record from Dr. Moray's office. Pet. Ex. 21, ECF No. 48.

Both parties filed status reports in May 2020 advising that all relevant evidence for a determination of onset had been submitted and the record was complete. ECF Nos. 49, 50. The record was subsequently closed on May 19, 2020 for purposes of determining onset. ECF No. 51.

This matter is now ripe for an onset ruling.

## II.     FACTUAL RECORD

### A.     Medical Records

#### 1.   Petitioner's Medical History Prior to Vaccination

Dr. Kaplan's past medical history includes but is not limited to chronic leg swelling—right greater than left, right neck pain, foot dragging, gout, back pain, leg cramps and a host of medical conditions unrelated to the claims herein. Pet. Ex. 1 at 1-2, 4, 6, 8; Pet. Ex. 3; Pet. Ex. 4 at 8-9.

In 1995, Dr. Kaplan saw Dr. Bralower for recurrent paresthesias of his right hand and part of his right face, which spontaneously resolved after several weeks. Pet. Ex. 19 at 11.[3]

In November of 2001, Dr. Kaplan suffered transverse myelitis possibly related to a flu vaccine. Pet. Ex. 2 at 1.[4] On December 15, 2001, Dr. Kaplan presented to Dr. Moray, a neurologist and reported paresthesia in his hands and feet when flexing his neck, which started 2-3 days after his November 1, 2001 flu vaccination. Pet. Ex. 19 at 11. MRI of the cervical spine taken on December 15, 2001[5] showed faint increased signal in the C1-2 level on T2 wave imaging. *Id.* at 12. Dr. Moray wrote it was "unclear whether the symptoms which occurred 5 years ago may have a relationship" to the 2001 symptoms (referring to the right hand and face paresthesias in 1995). Dr. Moray wrote, "the possibility of a post vaccination demyelination is raised, though he apparently had his flu vaccine only 2 to 3 days prior to onset of symptoms. It is usually more in the order of 7 to 14 days after vaccination that symptoms would occur" *Id.* at 13. Possible herpetic infection was noted to be consistent with neck pain and Dr. Kaplan had a history of recurrent herpetic lesions. *Id.* at 13. A lumbar puncture was performed with normal results. "Given the minimal symptoms" empiric treatment was not supported. *Id.* at 16.

A VAERS report dated December 17, 2001, reporting onset of symptoms on November 3, 2001 following a November 1, 2001 flu vaccine was filed. Pet. Ex. 19 at 7.

---

[3] No medical records from Dr. Bralower were filed; petitioner reported this history to Dr. Moray during his 2001 appointment with Dr. Moray. The records were included in petitioner's personal file filed after the Onset Hearing.
[4] Records associated with Dr. Kaplan's possible demyelinating condition in 2001, were contained in Dr. Kaplan's personal file filed after the initial hearing. Pet. Ex. 19.
[5] Dr. Moray noted two MRIs at the December 15, 2001 visit: "MRI of the cervical spine performed recently and repeated today." It is unclear when the prior MRI was taken; no additional MRI records were filed.

Dr. Kaplan presented to Dr. MacGillivray at Massachusetts General Hospital March 28, 2011 for a cardiac consultation. The record documents a history of C4[6] TM. Pet. Ex. 19 at 32.

Dr. Kaplan presented to Dr. Malins on May 17, 2011 with a thigh rash and questionable shingles. The assessment was herpes zoster without complication. Pet. Ex. 1 at 8.

On February 27, 2013, Dr. Kaplan presented to Dr. Lapp at Merrimack Valley Spine Center for follow up of degenerative disc disease. He reported five and a half weeks of lower back pain with no inciting event. He reported that in the past his back pain never lasted more than a week. He had pain in the midline with progression into the right buttock and toward the thigh but not beyond the knee. He was taking Tylenol. He was walking every day. He had no leg weakness or numbness and had lost thirty pounds. The assessment was lumbago and degeneration of the intervertebral disc. He was prescribed a Medrol Dose Pak and physical therapy. An MRI was ordered. Pet. Ex. 15 at 6-8.

The MRI of the lumbar spine performed on May 6, 2013, revealed extensive inflammatory changes in the soft tissue surrounding the facet joints at L4-5 disproportionate to the patient's degenerative changes. Pet. Ex. 16 at 2-4. The findings raised questions of spondylitis such as Reiter's syndrome, arthritis related to inflammatory bowel disease, or ankylosing spondylitis. *Id.* at 4. Clinical correlation was recommended. *Id.* There were mild degenerative changes scattered throughout the lumbar spine. The findings were most prominent at the L4-5 level where there was moderate to severe narrowing of the left, greater than right neural foramen. *Id.*

Dr. Kaplan returned to Dr. Lapp on May 17, 2013, with persistent low back pain. Pet. Ex. 15 at 4. He was noted to have pain of the foot/ankle (the specific leg was not documented), degenerative disc disease, spinal stenosis of the lumbar region without neurogenic claudication, low back pain, sciatica, radiculitis, and tibialis tendinitis. He was attending physical therapy with some relief but felt the Medrol Dosepak given at the last visit helped his leg pain. Dr. Lapp noted the increased and atypical appearance of the inflammatory changes around L4-5 seen on MRI and ordered blood work which showed positive ANA and Rheumatoid Factor (RF). Sedimentation rate and CRP were normal. *Id.* Dr. Lapp's impression was chronic right sided, buttock pain possibly due to L5 nerve root compression with atypical sciatica given the fact that his leg was better. Dr. Lapp further noted that he had advanced facet arthritis at L4-5 with a cyst, and his pain could be coming from the facet joint. Facet injection was discussed for the next visit. *Id.* at 5. Facet injections were performed on May 19, 2013. *Id.* at 3.

On March 17, 2014, petitioner presented to Dr. Weiner at Cardiology Associates of Lowell with left inguinal abscess. He was prescribed Keflex and referred to a surgeon. Pet. Ex. 1 at 6.

Petitioner returned to Dr. Malins on March 25, 2014, for chronic leg swelling which recently worsened. He had bipedal edema on examination, right greater than left, with no calf tenderness. He was prescribed Furosemide and medium compression thigh high stockings. Pet. Ex. 1 at 4.

---

[6] Dr. Kaplan's other medical records refer to a C2 TM.

Petitioner returned to Dr. Malins on June 2, 2014, reporting fatigue and a fall while walking. He had foot drag on the right according to his wife, though he disagreed. He reported bilateral neck pain for three-to-four days, greater on the right than the left, that preceded his fall. Pet. Ex. 1 at 1.

On October 21, 2014, petitioner presented to Dr. McNamara with a host of problems associated with both feet.  Pet. Ex. 4 at 8-9.

There are references in the record to appointments on January 26, 2015 and September 24, 2015 with Dr. Yeh and/or the Massachusetts General Hospital Cardiology. Pet. Ex. 18 at 8. However, these records were not filed.

On October 5, 2015, petitioner received a flu vaccine at Chelmsford Town Offices, Board of Health.[7] Pet. Ex. 5.

### 2. Petitioner's Medical History Following the Flu Vaccine

Petitioner's next visit with a medical provider was about six months after receipt of the subject flu vaccine, on March 28, 2016. Dr. Kaplan returned to Dr. Moray, whom he had last seen in December of 2001 after a November 2001 flu vaccine. On March 28, 2016, petitioner reported worsening strength in his left lower leg over the past three-to-four years. He had a limp. He reported falling two years ago and fracturing his right hand. He denied weakness in the right leg or bladder or bowel dysfunction. He reported that in 2013, he had lower back pain and an MRI at that time showed multilevel degenerative changes. Corticosteroid injections were helpful. He denied numbness or weakness of the upper extremities. Pet. Ex. 2 at 2. Following examination, Dr. Moray wrote, "there is slight increased tone left lower extremity with normal tone in the upper extremities. Upper extremity strength rated 5/5. Lower extremity testing shows iliopsoas (hip joint) to be 4+/5." *Id.* Gait was mildly spastic on the left. The assessment was myelopathy.[8] Dr. Moray added that petitioner demonstrated the same upper motor neuron dysfunction distribution as his previous deficits and "I would not be surprised if this represents a slow decline in neurological functioning related to his old transverse myelitis." Other etiologies including further demyelinating processes should be excluded and MRIs were ordered. *Id.* at 2-3. There was no mention of the October 5, 2015 flu vaccine.

MRIs were performed on April 7, 2016. MRI of the cervical spine showed abnormal ill-defined T2 and STIR hyperintense signal within the cervical cord. There was a question as to whether the lesions enhanced to show active process. Pet. Ex. 2 at 7-9; *see* Pet. Ex. 13. The radiologist recommended "contrast enhanced MRI imaging of the cervical cord to assess whether or not lesions enhance to suggest an active process."[9] Pet. Ex. 2 at 9. MRI of the thoracic spine was normal. "There are no findings to explain the clinical history. Incidental findings described

---

[7] Petitioner produced a letter from a nurse at the Department of Public Health dated June 5, 2017 listing petitioner's flu vaccines received there on October 6, 2014 and October 5, 2015.  No vaccination record was filed.

[8] Myelopathy is defined as any of various functional disturbances or pathologic changes in the spinal cord, often referring to nonspecific lesions in contrast to the inflammatory lesions of myelitis. *Myelopathy,, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=32732&searchterm=myelopathy* (last visited, Apr. 15, 2022).

[9] There is no indication that this testing was completed.

above." Pet. Ex. 2 at 15-17; *see* Pet. Ex. 12. MRI of the brain was normal for petitioner's age. Pet. Ex. 2 at 21-23; *see also* Pet. Ex. 14.

On April 28, 2016, Dr. Kaplan presented to Dr. McNamara for foot care. Dr. McNamara noted a left foot drop with a previous history of TM of the cervical region. Pet. Ex. 4 at 11. In addition to his podiatric findings, Dr. McNamara noted diminished muscle tone and strength in dorsiflexion eversion of the left lower extremity. Pedal pulses were palpable +2/4. All digits were pink and warm to the touch. Capillary return was less than 3 seconds. Dr. McNamara's diagnosis included abnormalities of gait and mobility, foot drop, left foot, and paralytic gait. *Id.* at 13. There was no mention of the October 5, 2015 flu vaccine in the record. Dr. McNamara prescribed a rigid Ankle Fixation Orthotic ("AFO"). Pet. Ex. 6 at 30.

On May 11, 2016, petitioner was evaluated for an AFO for myelitis, stenosis, and drop foot at the Hanger Clinic by John Dieli, CPO. The mechanism of injury was listed as C5[10] myelopathy with left foot drop. Pet. Ex. 6 at 31. His left ankle strength was poor. *Id.* at 32. He received his AFO on May 25, 2016. *Id.* at 28. Adjustments to the AFO were made on June 8, 2016 and it appears that a WalkAide Stimulator ("WA") trial was suggested. *Id.* at 26-27. Petitioner followed up again on June 22, 2016 and Mr. Dieli noted, "will attempt to f/u on last time to trail (sic) the WA w/Sarah Rotondo, PT, I will coordinate w/Sarah and pt." *Id.* at 25.

There are no records between June of 2016 and September of 2016; however, petitioner's personal record contains VAERS information during this period of time.  More specifically, there is a July 18, 2016 letter from VAERS acknowledging receipt of a VAERS report for a November 1, 2001 flu vaccine. Pet. Ex. 19 at 20-21. It appears that two reports were sent: one VAERS form completed by a registered nurse on December 17, 2001 regarding the November 2001 vaccination and another VAERS report completed by petitioner regarding his November 2001 vaccination with additions about his October 2015 vaccination. The second VAERS report completed by petitioner was completed after June 8, 2016[11] and edited at a later unknown date. Pet. Ex. 19 at 6-9. Of note, a handwritten narrative by Dr. Kaplan responding to VAERS Form question 7, "Describe adverse event(s)," states,

> 7. 2-3 days after the [2001] flu vaccination I developed bilateral tingling of the hands and feet. It was more pronounced when flexing my neck. In past few years "L" leg lost muscle mass. I began tripping and falling which has worsened in (sic) past 6 months. Continued in next page.

> 7. Continued. *11/14/2016.* I returned to see Dr. Jonathan Moray (my neurologist). *3/2016.* I have weakness in my "L" leg. I also have developed "L" foot drop and clonus of my "L" foot. I was fitted with an AFO on my "L" leg which helps some. The PT company suggests I try a stimulator which will make my foot raise as I

---

[10] This is likely a mistake in the record as petitioner's 2001 MRIs showed a lesion at C2, not C5.

[11] Though the second VAERS report does not have the "Date Completed" box filled in, Dr. Kaplan's age is reported as 68 (birthdate of 3/13/1948 noted) suggesting it was authored in 2016. Additionally, petitioner references having been fitted with an AFO, which happened on May 25, 2016 and having a WA trial recommended, which occurred at his follow up on June 8, 2016. *See* Pet. Ex. 6 at 26-28. It appears this report, without edits, was one of the reports sent to VAERS eliciting the July 18, 2016 letter from VAERS.

walk. *I did and it worked. I bought it last week. It cost over $5300.* The condition has caught up to me over the years apparently…See previous VAERS report enclosed…*I have noted in past 2 years that my balance was not as good as usual but felt it was age related. I had flu shots yearly as my neurologist felt my symptoms I had in 2001 were not related to the flu vaccine. The last one I had on October 6, 2015. My wife thinks I have been having problems walking & dragging my left foot for a year or 2 but it became much more noticeable after my last flu vaccine in October. She felt I was in denial and made me go back to my neurologist in March 2016.*

Pet. Ex. 19 at 8-9 (edits italicized).[12] It is not clear whether the forms sent to VAERS included the later edits or when exactly the edits were made. [13]

On September 28, 2016, petitioner presented for trial use of a WA stimulator for drop foot. Pet. Ex. 6 at 20. He was noted to be using an AFO on his left leg for approximately three months. *Id.* at 17. His diagnosis for the drop foot was "myelitis (C2)" and "Transverse Myelitis." *Id.* at 19. Petitioner's WA trial ended on October 12, 2016. *Id.* at 13.

Following petitioner's successful trial with the WA, Dr. McNamara prescribed the unit for left foot drop on October 26, 2016. Pet. Ex. 4 at 15, 17.  He also issued a prescription for gait training and strengthening of the left lower extremity, especially the knee for drop foot/transverse myelitis. *Id.* at 18. Petitioner purchased the WA on October 31, 2016. Pet. Ex. 6 at 8. An adjustment of the WA was performed on November 23, 2016. *Id.* at 6.

Around October 28, 2016, Dr. Kaplan communicated with a doctor well-known in the Vaccine Program who routinely testifies as an expert witness on behalf of petitioners. Their email exchange was as colleagues, not as patient and practitioner, and indicates that a phone call was scheduled between the two. Following their phone call, the doctor emailed Dr. Kaplan recommendations of attorneys that practice in the Vaccine Program. *See* Pet. Ex. 19 at 16-18.

Thereafter, on December 19, 2016, Dr. Kaplan presented for physical therapy at Northeast Rehabilitation Health Network and for the first-time reported onset of left lower extremity weakness in November of 2015 claiming it was the result of "the flu shot." Pet. Ex. 7 at 6, 9. He denied treatment for this diagnosis before. He reported using a muscle stimulator on the left for drop foot for about 2-3 months and an AFO for 6-8 months. *Id.* at 9. His prior level of functioning was noted as "progressive weakness" of his left lower extremity, and his goal was to get stronger. *Id.* at 9. Petitioner attended 6 physical therapy sessions. *See generally,* Pet. Ex. 7.

At a January 26, 2017 visit with cardiologist Dr. Yeh, she noted:

---

[12] Based on the records filed, it appears that petitioner did not attend physical therapy during this time; however, petitioner references a "PT company" in his own handwritten narrative, which may be in reference to the Hanger Clinic.

[13] Though it is not clear exactly when the report was edited, it appears that the edits were made sometime in November of 2016 as the "11/14/2016" appears without context and based on petitioner's reference to the purchase of a stimulator "last week" which was not purchased until October 31, 2016. Pet. Ex. 6 at 8.

> Since our last visit September 24, 2015, he has developed a new foot drop and has
> a new left foot stimulator. He developed transverse myelitis after a flu shot in
> October of 2015 and his symptoms related to foot drop have progressed since that
> time requiring physical therapy and now he has noted improvement with the nerve
> stimulator. He is able to walk on flat ground but has trouble walking up stairs or
> inclines.

Pet. Ex. 18 at 14.

On January 27, 2017, petitioner called Dr. Moray's office, requesting to speak with Dr.
Moray. Dr. Moray spoke with petitioner later in the day and summarized the call in his notes:

> I will write a letter summarizing his MRI findings in addition to clinical information
> which she (sic) has given me today. In particular, he received a flu vaccine in
> October 2015. Within a month after receiving the vaccine the patient began to have
> increasing stiffness and incoordination of the left leg. This was in addition to an
> episode of transverse myelitis many years ago which occurred after an earlier flu
> vaccination. I have dictated a note.

Pet. Ex. 21 at 3.[14]

Dr. Moray authored a letter dated February 2, 2017 documenting petitioner's receipt of a
flu vaccine in October of 2015. Pet. Ex. 2 at 1. Dr. Moray further documented a history of cervical
TM after an influenza vaccine 15 years prior[15] for which he evaluated petitioner. In 2001, spinal
fluid was normal, there were no oligoclonal bands and petitioner had a complete recovery. Dr.
Moray then wrote that at petitioner's March 28, 2016 visit, petitioner reported weakness in the left
leg interfering with his gait and suffering a fall.  Petitioner reported receipt of a flu vaccine in
October of 2015 with significant gait worsening one month later.[16] Unfortunately he did not see
petitioner until five months after vaccination. *Id.* Dr. Moray continued that petitioner had weakness
of the iliopsoas bilaterally with a spastic gait on the left and slowing of fast foot motions. MRIs on
April 7, 2016 of the brain showed no abnormalities and the cervical spine showed faint change on
T2 imaging in the cervical cord at C2, more prominent on the right. A second area at the medullary
cervical junction was noted as well.[17] Slight cord atrophy consistent with an old lesion was also
noted, though the timing of the lesion was unknown. Dr. Moray concluded that the diagnosis was
TM perhaps exacerbated by repeat flu vaccination in October of 2015.[18] He could offer only

---

[14] This record, Petitioner's Exhibit 21, was not contained in Dr. Moray's office record but was filed after the
Supplemental Onset Hearing at which Dr. Moray testified.

[15] Dr. Kaplan affirmed that in 2001 Dr. Moray did not feel the demyelinating lesion on the MRI was related to the
flu vaccine so he continued to get annual vaccines. Pet. Ex. 8 at 2. Dr. Moray's record confirms that in 2001 Dr.
Moray did not suspect the flu vaccine to have caused the demyelinating lesion. *See* Pet. Ex. 19 at 13.

[16] This is not contained in the medical records for March 28, 2016.

[17] Dr. Moray never concluded that there was an additional lesion. Dr. Moray confirmed this in his May 20, 2019
record and testimony. Tr. 29.

[18] None of this information is contained in the March 28, 2016 medical record and is inconsistent with that record
which documented a slow decline in neurological functioning.

symptomatic treatment and to avoid further flu vaccines.[19] He prescribed Baclofen and a brace for the left foot to minimize falls. *Id.*

Petitioner was discharged from therapy after six visits with improved quad strength. Pet. Ex. 7 at 7.  He presented for adjustment of the stimulator on April 26, 2017. Pet. Ex. 6 at 2.

At a March 21, 2018 visit with his cardiologist, petitioner was noted to have persistent foot drop related to TM following flu shot of 2014[20] without improvement. Mobility had significantly improved with a nerve stimulator. He had retired and moved to a condominium where he bought two units and installed an elevator. Pet. Ex 18 at 10.

At his April 25, 2019 visit with the cardiologist, his drop foot and use of a nerve stimulator was noted. He reported stairs were more challenging with the foot drop. Pet. Ex. 18 at 7. He still walked 2-3 miles daily with the dog and had lower extremity edema requiring Lasix. *Id.*

Petitioner returned to Dr. Moray on May 20, 2019. Pet. Ex. 17 at 2. He had not been seen since March of 2016.  Dr. Moray's medical record for this visit documents that petitioner sustained TM that he felt was related to flu vaccination going back about 20 years. He remained stable for many years then had a repeat flu vaccination "which precipitated a precipitous decline in his functioning." He has avoided flu vaccines at this point but continued to decline in functioning. "He had MRIs performed which I personally reviewed in 2016. I did not feel that there was (sic) any new lesions." *Id.* He reports limping more and having difficulty with going up stairs due to leg weakness. He notes there may be some proximal left upper extremity weakness versus pain. He has a left leg brace but reports falling once a month. *Id*. On examination left iliopsoas was rated as 3/5 with left tibialis anterior rated 2/5. Gastrocnemius on the left rated 3/5. Right leg was normal. There was normal pain perception with decreased vibration to the left ankle. Gait was impaired due to leg weakness. Dr. Moray wrote that petitioner's weakness had progressed to cause significant disability. "The diagnosis remains the same that being transverse myelitis precipitated by flu vaccination." *Id.*

## B.    Affidavit and Testimonies

### 1.    Affidavit and Testimony of Petitioner, Dr. Kaplan

Dr. Kaplan submitted an affidavit and testified at the hearing. Pet. Ex. 8; *See* Transcript of August 6, 2019 ("Tr.") at 4-72.

As a pediatrician, Dr. Kaplan received annual flu vaccines. Pet. Ex. 8 at 2; Tr. 7. In November of 2001, he received a flu shot at the local board of health and three days later developed bilateral tingling of the hands and feet especially with flexion of his neck. Pet. Ex. 8 at 2; Tr. 7. He was examined by Dr. Moray on December 15, 2001 and an MRI, spinal tap, and blood work were performed. Dr. Kaplan stated he learned directly from the radiologist that the MRI showed C2 transverse myelitis. Pet. Ex. 8 at 2; Tr. 7-9. According to Dr. Kaplan "[r]epeat MRIs over the years

---

[19] This was not contained in the March 28, 2016 medical records.
[20] This date is an error, which petitioner confirmed during his testimony.

revealed the continued presence of a 'hole' in my spinal cord."[21] Pet. Ex. 8 at 3.  Dr. Kaplan did not recall if he spoke to Dr. Moray after his MRI results, only that he was told that he did not need to follow up unless his condition worsened because "[H]e didn't have a lot of things that he could do for me." Tr. 9.

Dr. Kaplan stated he believed his C2 TM was caused by the flu vaccine and reported it to VAERS in 2001. Tr. 17.  However, Dr. Moray did not believe the demyelinating lesion was related to the flu vaccine in 2001 because "there was no literature noting that flu vaccine could cause C2 –could cause transverse myelitis . . . [Dr. Moray] felt there was no literature. He couldn't say that it was from the flu shot even though I told him that I thought it was." Tr. 18.  Nonetheless, Dr. Kaplan continued receiving flu vaccines every year thereafter. Pet. Ex. 8 at 2-3.

Dr. Kaplan stated that the numbness and tingling in 2001 did not affect his ability to work and his symptoms resolved over time. Pet. Ex. 8 at 2; Tr. 9-10. He lost some muscle mass in his left leg but did not have any weakness or problems walking which is his major exercise. Pet. Ex. 8 at 2; Tr. 10. He "made a very good recovery." Tr. 12.

According to Dr. Kaplan, between his good recovery and the October 2015 flu shot, he was doing all the activities he always did. Tr. 13. He did not recall seeing any physicians annually or for preventive healthcare. Tr. 15.  He admitted to having intermittent limping when fatigued prior to his October 2015 flu shot, though he could not remember when it started but knew "it was nothing like it was after the last flu shot". Pet. Ex. 8 at 3; Tr. 36. "I think it was very—it was so mild that nobody ever noticed it except for me." Tr. 64. The limping he referred to in the Petition started around the weekend of Mrs. Kaplan's high school reunion, November 7-8, 2015. *See* Tr. 30.

Dr. Kaplan denied dragging his right foot and did not recall a fall as documented in his medical record on June 2, 2014. Tr. 37; *See* Pet. Ex. 1 at 1. He recalled falling at some point and claimed he was looking at a very beautiful motorcycle next to him, hit an uneven sidewalk, and fell. Tr. 37. He broke a couple fingers in the fall. Tr. 38-39.[22] He testified that this would have been his September 2011 fall and did not recall any other fall or a fall in 2014. *See* Pet. Ex. 7 at 35; Tr. 39. When asked if he disputed the fall and trouble walking documented in June of 2014, petitioner merely responded, "I don't recall that. The fall with the motorcycle was when I did the thing with my fingers." Tr. 39.

Dr. Kaplan affirmed an onset of significant left foot dragging then tripping after the October 5, 2015 flu vaccine, which was "not something that I had done before." Pet. Ex. 8 at 3. At hearing, he stated that limping and some tripping started around the weekend of his wife's high school reunion or slightly before, around November 7, 2015, but he ignored it. Tr. 13, 30, 40. He also claimed the foot dragging started around this time because his sneakers and shoes before the flu shot were "perfectly normal," but after the flu shot, showed "marked wear in the front part of the sneaker." Tr. 40.

---

[21] These "repeat MRIs over the years" were not filed.
[22] There is a fall in 2011, Pet. Ex. 7 at 35, and a fall in 2014, Pet. Ex. 1 at 1, documented in the records.

Dr. Kaplan affirmed that at some point thereafter, "the limping became much more noticeable to the point that people started commenting about it." Pet. Ex. 8 at 3. But "I denied that that I had problems. I—that's just me." Tr. 40. Dr. Kaplan affirmed that people in his office asked about his limping though he could not recall when that was, but it was after the flu shot. He also recalled his brother-in-law asking about his limping the weekend of the reunion while out walking their dogs. Tr. 28-30, 46. He affirmed that he was not experiencing symptoms when Mr. and Mrs. Price stayed in his home. Tr. 45.

Dr. Kaplan stated he "finally" made an appointment with Dr. Moray in March of 2016 after his wife "nagged [him] enough." Pet. Ex. 8 at 3; Tr. 14. He added, "I know I'm a physician, but I didn't like doctors very much. There are reasons that I didn't like them very much." Tr. 27. He provided that he disliked doctors because it took until he was 63 years old for him to be diagnosed with an anomalous right coronary artery. Tr. 27.

Dr. Kaplan claimed that he told Dr. Moray that he received a flu vaccine in October 2015, that the MRI at that time showed remnants of the C2 TM and "a second smaller lesion in the same vicinity as the earlier transverse myelitis," and that Dr. Moray felt the two lesions on the MRI were "probably related to [the] symptoms that I was having." [23] Pet. Ex. 8 at 3; Tr. 16-17, 544-55. Dr. Kaplan testified that on March 28, 2016, Dr. Moray "immediately" told Dr. Kaplan that there was now medical literature supporting the causal connection between flu vaccines and the development of TM. *See* Tr. 18. Dr. Moray diagnosed him with recurrent TM and told him not to receive any more flu vaccines. Pet. Ex. 8 at 3. Dr. Kaplan acknowledged that the March 28, 2016 medical record did not mention the flu vaccine on October 5, 2015, but "I know I talked to him about [the flu vaccine] at the visit." Tr. 49

Dr. Kaplan denied any leg weakness in 2001, only numbness and tingling. When presented with Dr. Moray's record for March 28, 2016 which documented that his leg weakness from 2001 had improved, he responded that "he never had left lower weakness until after the last flu shot." Tr. 33-35. When questioned about the medical record documenting his reporting "over the last three to four years he has had a slow worsening of strength in the left lower extremity," he suggested that Dr. Moray meant to write three to four months because he "definitely wasn't having trouble for three or four years…[Y]ou'd really have to ask [Dr. Moray] that question" Tr. 39. Dr. Kaplan further denied ever discussing "a slow decline in neurological functioning related to his old transverse myelitis" with Dr. Moray and suggested that Dr. Moray be asked why he included that in the record. Tr. 48.

Dr. Kaplan testified that he in fact presented to the March 28, 2016 visit with foot drop and Dr. Moray found leg weakness with foot drop, despite it not appearing in the records. He further denied that the foot drop developed after March 2016 stating it was already present at that examination. *See* Tr. 67.

Dr. Kaplan stated he prepared VAERS reports in 2001 and in 2015 but could not remember if he filed either. Tr. 18-19. He stated he spoke to someone at VAERS in 2016 who told him about

---

[23] This conclusion regarding the MRIs does not appear in the March 28, 2016 record, the February 2, 2017 letter, or the May 20, 2019 record, and is contradicted by Dr. Moray's testimony.

a federal no-fault insurance for vaccine injuries. He contacted somebody at the federal government, and they recommended that he hire a lawyer. Tr. 19.

When questioned about Dr. Moray's February 2, 2017 letter he could not recall why the February 2, 2017 letter was written, "… but I may have asked him to write a letter for me." Tr. 49. When asked about the content of the letter, the inconsistencies with Dr. Moray's office record for the March 28, 2016 and May 20, 2019 visits, and the reference to the October flu vaccine in the letter that was not contained in the March 28, 2016 visit record, he stated, "You'd have to ask him." Tr. 50. When pressed further, Dr. Kaplan stated "I really don't remember exactly how I – how this came about. I just don't remember."[24] Tr. 53.

Dr. Kaplan testified to his foot drop getting worse since it developed, prior to March 28, 2016, but conceded the medical record contains no reference to it until April 28, 2016 when he saw Dr. McNamara. Tr. 68. He stated that Dr. McNamara recommended the use of an AFO brace and John Dieli, suggested the stimulator to help raise his foot as he walked. He had improvement with the stimulator and purchased it. It was not covered by insurance. Pet. Ex. 8 at 4; Tr. 22.

Affirming that he had a full recovery after his first episode of TM in 2001, Dr. Kaplan testified that he now has obvious limping, is easily fatigued, lacks endurance, must consider his terrain to account for his limitations in mobility and has trouble with stairs as a result of the October 2015 flu vaccine. Pet. Ex. 8 at 3-4; Tr. 25. He installed an elevator in his condo so he can get to every floor, because he cannot walk as much as he used to. Tr. 21-22, 25. He expressed concern about holding his grandson, that he would "trip and fall and drop him." Tr. 25. Physical therapy strengthened his left leg but provided only limited relief for his "deteriorating ability to ambulate." Pet. Ex. 8 at 3-4.

### 2.   Affidavit and Testimony of Petitioner's Wife, Cynthia Kaplan

Cynthia Kaplan is Dr. Kaplan's wife. She submitted an Affidavit and testified at the hearing on August 6, 2019. *See* Tr. 112-157.

Mrs. Kaplan affirmed that Dr. Kaplan had TM in 2001 with a "great recovery."  However, in the past few years, she noticed that he started dragging his leg, it was mild and did not cause any problems with his walking 3 or more miles a day. She walked with him occasionally. Pet. Ex. 9 at 2. At hearing, Mrs. Kaplan testified that prior to November 2015, she "sometimes noticed that he had a limp or would kind of drag or scuff his foot" when petitioner was tired. Tr. 116. The left leg dragging could have been before October 2015. Tr. 135-36. Additionally, prior to October 2015, she did sometimes "hear his toe rub on the floor from his shoes" when he limped. Tr. 143.

When asked about Dr. Kaplan's June 2, 2014 medical record documenting that he "fell while walking; dragging R foot, according to his wife…" Mrs. Kaplan stated it was petitioner's

---

[24] Given that the letter was over a year and half after his claimed onset, it is difficult to understand how his memory is so clear with regard to earlier facts of onset yet nonexistent regarding a letter he requested.

left foot, not his right, that he limped with.[25] Tr. 138. She did not recall him falling in June of 2014 but did observe in the last three or four years that Dr. Kaplan's left leg was considerably smaller than his right leg. Tr. 138-39.

Mrs. Kaplan stated she received a flu vaccine at the same time as Dr. Kaplan in October of 2015. According to Mrs. Kaplan, Dr. Kaplan's foot dragging became more noticeable around November 7, 2015, which was her fiftieth high school reunion. They stayed at the resident of her brother and sister in-law, and her brother asked about petitioner's limp after a walk with Dr. Kaplan and their dogs. Pet. Ex. 9 at 2; Tr. 120.  She testified that she then started "paying more attention to [Dr. Kaplan's] walking" and became more concerned when Dr. Kaplan had an increase in tripping. Tr. 121-123, 144. "He never used to trip before, but then he started." Tr. 142.  She expressed her concerns to Dr. Kaplan, but he ignored his tripping for a while Tr. 123-24.

Mrs. Kaplan discussed a visit with the Prices in Florida in February of 2016 and that Mrs. Price asked during a walk home from dinner, "how come Eric's limping?" Pet. Ex. 9 at 2; Tr. 124.

Mrs. Kaplan affirmed that Dr. Kaplan's left foot dragging increased, and he developed some problems going up and down the stairs. Pet. Ex. 9 at 3. She recalled mentioning her concerns about his left leg to him approximately five times between October and March of 2016. Tr. 142. At the end of the winter,[26] she insisted he see Dr. Moray after he "actually tripped two times where he almost fell." Tr. 126. "I said, 'This is not normal. You really have to go and get this checked out.'" Tr. 144. He went to Dr. Moray in March of 2016. Pet. Ex. 9 at 3.

Mrs. Kaplan believed Dr. Kaplan put off seeing a doctor because "I thought he was in denial" or "maybe he had some inkling of what was wrong and he just didn't want to get the bad news." Tr. 127; Pet. Ex. 9 at 3. Mrs. Kaplan claimed after seeing Dr. Moray, "he seemed somewhat relieved that [the flu shot] could be causing the symptoms that he had." *Id.* Dr. Moray told Dr. Kaplan that he suffered another episode of TM in "about the same area as the initial episode that had occurred in 2001." Pet. Ex. 9 at 3.

Mrs. Kaplan testified that petitioner likely followed up with Dr. Moray in May of 2019 "because he was going to have this hearing and thought it might be good to do another follow up before the hearing." Tr. 149.

According to Mrs. Kaplan, petitioner's condition has continued to worsen since March of 2016 and he has fallen at home, at the beach, and walking in a public garden. *See* Tr. 128-29.

### 3. Affidavit and Testimony Petitioner's Friend, Judith Price

---

[25] There is a discrepancy in the records referring to issues with his right leg. However, when he presented for care on March 28, 2016, he reported no issues with his right foot/leg but three-to-four years of left leg issues. As Mrs. Kaplan testified, the records referring to right leg/foot issues in the years prior to 2015 were inaccurate.

[26] Winter 2015-16 ended on March 20, 2016. According to Mrs. Kaplan, mid-to-late March would be when petitioner's tripping was severe enough that she insisted he see a doctor.

Mrs. Price and her husband were neighbors of the Kaplans and friends for several decades Pet. Ex. 10 at 2; Tr. 80.[27] Their families travelled, spent Jewish holidays together, went to the theater, and frequently had dinner; in general, the families "saw each other a lot." Tr. 80-81, 88. Mrs. Price recalled going to China with the Kaplans, "maybe 2002" but did not recall Dr. Kaplan being ill or having transverse myelitis in 2001. Tr. 92-93.

The Prices sold their home in October of 2015 and stayed with the Kaplans until November 3, 2015. Pet. Ex. 10 at 2. "During the time that we stayed with the Kaplans, I did not notice any difference in Eric's physical condition."[28] Pet. Ex. 10 at 2; Tr. 82. Mrs. Price was unsure if they stayed "one or two nights", but they did not go on any walks or do activities together. Tr. 88.

Mrs. Price affirmed that "When the Kaplans came to visit us in February 2016 in Florida, I noticed immediately that Eric was limping and dragging his left foot. The change in his physical condition was very apparent from when I last saw him in early November 2015." Pet. Ex.10 at 2-3.  At the hearing, Mrs. Price recalled, "He [Dr. Kaplan] limped in Florida… Yes, I did notice it once, yes," and she asked Dr. Kaplan's wife about it. Tr. 85.

### 4.  Affidavit and Testimony of Petitioner's Brother-In-Law, Richard Skowyra

Mr. Skowyra is Dr. Kaplan's brother-in-law and Mrs. Kaplan's brother. Pet. Ex. 11 at 2. The Kaplans stayed with him during the first weekend of November 2015 [29] so they could attend Mrs. Kaplan's fiftieth high school reunion. Pet. Ex. 11 at 2.

Mr. Skowyra affirmed that on Saturday, November 7, 2015, petitioner was "walking funny, "favoring his left foot and had a noticeable limp." Pet. Ex. 11 at 2.  At hearing, Mr. Skowyra stated he noticed petitioner's limp while he and petitioner were out walking their dogs. "[H]e got ahead of me for a while, and I noticed he was favoring his left foot, and he had a noticeable limp in it." Tr. 97-98. He did not mention the limp to Dr. Kaplan because he "didn't want to embarrass him or anything" but he did mention it to Mrs. Kaplan when the two got back home later that day. Tr. 98. "I told her, 'I saw Eric limping. Do you know why?' And she says, 'I noticed it, too, but I don't know what's causing it." Tr. 99.

Prior to November 2015, Mr. Skowyra last saw petitioner on July 26, 2015 at his granddaughter's christening; he observed petitioner walking normally without a limp. Pet. Ex. 11 at 2.

### 5.  Testimony of Petitioner's Physician, Dr. Jonathan Moray

Dr. Jonathan Moray testified in this matter on January 29, 2020. *See* Transcript of January 29, 2020 ("Supp. Tr.") at 5-52.

---

[27] During her testimony she affirmed meeting Ms. Kaplan forty-one years ago. Tr. 80.  In her affidavit, Ms. Price wrote that she had known Eric for more than twenty years. Pet. Ex. 10 at 1.

[28] This would place onset sometime after November 3, 2015.

[29] November 2015 started on a Sunday; the first full weekend was November 7-8, 2015.

Dr. Moray recalled that his first meeting with Dr. Kaplan was a consultation on December 15, 2001 for tingling in Dr. Kaplan's hands and feet. Supp. Tr. 8. Dr. Kaplan had reported that his symptoms began six weeks prior to the consultation, about two three days after he received a flu vaccine. Supp. Tr. 9, 21. Dr. Moray ordered an MRI on which he saw an abnormality inside the spinal cord at the C1-2 level. There was no etiology for the lesion. Supp. Tr. 10-11.

At that time, Dr. Moray speculated that the paresthesia of the right hand and the right face Dr. Kaplan experienced in 1995 could have been an initial attack of demyelination or multiple sclerosis and the 2001 symptoms were possibly a continuation. *See* Supp. Tr. 11-12. Dr. Moray stated that he considered the possibility of a post-vaccination demyelination, but his understanding was that TM would take seven to fourteen days to develop. Supp. Tr. 13, 33. Dr. Moray testified that he was taught this understanding of TM onset and did not indicate that his understanding had changed. *See* Supp. Tr. 13.

Dr. Moray stated that he did not see Dr. Kaplan again until 2016 when he presented for "worsening weakness of his leg." Supp. Tr. 14. Dr. Moray stated that Dr. Kaplan reported that his leg symptoms began "three or four years prior to the 2016 office visit." Supp. Tr. 14.

Referencing the medical record from March 28, 2016, Dr. Moray affirmed that he wrote, "[t]ransverse myelitis with worsening left lower extremity weakness, question new demyelinating lesions." Supp. Tr. 15; Pet. Ex. 2 at 3. But he also noted that he wrote, "I would not be surprised if this represents a slow decline in neurological functioning related to his old transverse myelitis." Supp. Tr. 16. Dr. Moray confirmed these were his opinions at the time he saw Dr. Kaplan on March 28, 2016. *See* Supp. Tr. 15-16.

Dr. Moray ordered MRIs of the brain, cervical, and thoracic cord "to see if there was (sic) any new abnormalities that would explain his symptoms". Supp. Tr. 14, 16. Dr. Moray stated that the 2016 MRIs seemed to show an additional lesion not seen in the 2001 imaging but pointed out that "newer technology may have identified an abnormality that could not be seen on the original study." Supp. Tr. 18. As he wrote in his records later, he "did not feel that there [were] any new lesions" on the 2016 MRIs and was unaware of any way to determine whether one lesion is older than another; cord atrophy represents that a lesion is old but does not help in determining when lesions occurred. Supp. Tr. 27. Dr. Moray stated the cervical MRI done in 2016 was consistent with petitioner's old transverse myelitis. Supp. Tr. 41.

Dr. Moray testified that during the March 28, 2016 visit, he was unaware that Dr. Kaplan received a flu vaccine in October of 2015. "In 2016, I believe [Dr. Kaplan] did not mention the flu vaccine relationship at that time." Supp. Tr. 16; 21; 36. On cross examination, he again stated "the only thing I do recall is I do not remember the flu vaccine issue coming up at all during that visit." Supp. Tr. 35.

Dr. Moray was questioned about his February 2, 2017 letter in which he wrote that Dr. Kaplan's diagnosis was "transverse myelitis, perhaps exacerbated by repeat flu vaccination in October 2015." Dr. Moray stated he relied on what Dr. Kaplan told him about receiving a vaccination and things worsening after the vaccine in coming to this conclusion—"it just seemed that [flu vaccines] may have been precipitating or worsening his neurological dysfunction based

on his history." Supp. Tr. 20. Dr. Moray could not recall when he learned of the vaccine but it had to have been March 2016 and February 2017 because he wrote about it in the February 2, 2017 letter. Supp. Tr. 22-23. Dr. Moray was unable to reconcile the content of the February 2, 2017 letter that attributed Dr. Kaplan's worsening symptoms to his October 2015 vaccination when his record for petitioner's March 28, 2016 visit documented progressive weakness for three to four years. "I can only say…I got this history from the patient and this is what the patient told me." Supp. Tr. 25; *see also* Supp. Tr. 40. Dr. Moray again confirmed that Dr. Kaplan reported a progression of leg weakness for three to four years at his March 28, 2016 visit. Supp. Tr. 24, 35.

Dr. Moray addressed Dr. Kaplan's record for May 20, 2019 which documented that petitioner's 2016 cervical MRI showed additional lesions and "transverse myelitis precipitated by the flu vaccination." Pet. Ex. 17 at 2. Dr. Moray stated he did not know which year he was referring to or the timing of all of Dr. Kaplan's flu vaccines but confirmed that he did not find any new lesions on petitioner's 2016 cervical MRI. Tr. 49. He ultimately admitted, that like his February 2, 2017 letter, his May 20, 2019 record documenting the flu vaccine as causing an exacerbation of TM was "based strictly on the history" Dr. Kaplan told him and that there was no medical basis. Supp. Tr. 51.

### III.     LEGAL STANDARDS REGARDING FACT FINDING

Petitioner bears the burden of establishing his claims by a preponderance of the evidence. § 13(a)(1). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for making factual determinations in Vaccine Program cases begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). Medical records created contemporaneously with the events they describe are generally presumed to be more trustworthy. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that *Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). Contemporaneous medical records are also afforded more weight than petitioner statements created after the fact. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014). Overall, contemporaneous medical records that are clear, consistent, and complete warrant substantial weight "as trustworthy evidence." *Id*. Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006); *see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948). Petitioners can support their claim with oral testimony if it is credible and consistent with the medical records. *See, e.g.*, *Stevenson ex rel. Stevenson v. Sec'y of Health & Human Servs.*, No. 90-2127V, 1994 WL 808592, at *7 (Fed. Cl. Spec. Mstr. June 27, 1994) (crediting the testimony of a fact witness whose "memory was sound" and "recollections were consistent with the other factual evidence"). The special master is then

16

required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (noting it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such a determination is evidenced by a rational determination).

There are situations in which compelling oral testimony may be more persuasive than written records, such as in cases where records are deemed to be incomplete or inaccurate. *See Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."). The Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be given. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is used to overcome the presumption of accuracy given to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (vacated on other grounds, *Sanchez by & through Sanchez v. Sec'y of Health & Human Servs.*, No. 2019-1753, 2020 WL 1685554 (Fed. Cir. Apr. 7, 2020), review denied, *Sanchez by & through Sanchez v. Sec'y of Health & Hum. Servs.*, 152 Fed. Cl. 782 (2021)) (quoting *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)); *see, e.g., Stevenson ex rel. Stevenson v. Sec'y of Health & Human Servs.*, No. 90-2127V, 1994 WL 808592, at *7 (Fed. Cl. Spec. Mstr. June 27, 1994) (crediting the testimony of a fact witness whose "memory was sound" and "recollections were consistent with the other factual evidence"). Moreover, despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Vallenzuela v. Sec'y of Health & Human Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.*, No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994) (explaining that § 13(b)(2) "must be construed so as to give effect to § 13(b)(1) which directs the special master or court to consider the medical record...but does not require the special master or court to be bound by them"). Special Masters may find onset within the time period described in the Vaccine Injury Table even if the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period. § 13(b)(2). In short, all relevant evidence on the record must be considered. *See* § 13(b).

## IV.   DISCUSSION & ANLAYSIS

### A.  Review of the Relevant Record

#### 1.  Medical Records[30]

In December of 2001, Dr. Kaplan presented for neck pain and paresthesia in his hands and feet, which started two to three days after his November 1, 2001 flu vaccination. An MRI at that time showed faint increased signal in the C1-2 level on T2 wave imaging. Pet. Ex. 19 at 11-12. It was Dr. Kaplan's belief that he suffered transverse myelitis related to his flu vaccine in November of 2001. Pet. Ex. 2 at 1.[31]  Dr. Moray was not convinced, believing onset of two to three days after the vaccine was too soon.[32] Pet. Ex. 19 at 13. A lumbar puncture was normal and "given the minimal symptoms," no treatment was offered. *Id.* at 16. Following his appointment, Dr. Kaplan completed a VAERS report on December 17, 2001 reporting onset of his symptoms on November 3, 2001 following a November 1, 2001 flu vaccine. *Id.* at 7.

In 2013, Dr. Kaplan sought care for lower back pain radiating into his right leg; he presented to a physician within six weeks of the issue. Pet. Ex. 15 at 6- 8. An MRI included findings at the L4-5 level with moderate to severe narrowing of the neural foramen on the left greater than right.  Petitioner followed up when his low back pain persisted—pain in his foot/ankle was also noted though which foot was not indicated. Pet. Ex. 15 at 4.

In 2014, Dr. Kaplan sought care for chronic leg swelling that had worsened. He had bipedal edema, right greater than left. Pet. Ex. 1 at 4.  He also presented to his podiatrist, Dr. McNamara reporting gradual onset of right foot pain and a host of podiatric issues. Pet. Ex. 4 at 8-9. At a June 2, 2014 medical visit, Dr. Kaplan reported twenty-four hours of fatigue and a fall while walking with bilateral neck pain for three-to-four days that preceded the fall. Though he disagreed, petitioner's wife reported a foot drag on the right[33] at that visit. Pet. Ex. 4 at 1.

Dr. Kaplan received the subject flu vaccine on October 5, 2015.

On March 28, 2016, Dr. Kaplan presented to Dr. Moray reporting worsening strength in his left lower leg over the past three-to-four years. He had a limp. He denied weakness in the right leg. He reported a history of lower back pain with MRI showing multilevel degenerative changes. Pet. Ex. 2 at 2. Examination on that day showed "slight increased tone left lower extremity with normal tone in the upper extremities. Upper extremity strength rated 5/5. Lower extremity testing shows iliopsoas (hip joint) to be 4+/5." *Id.* Gait was mildly spastic on the left. The assessment was myelopathy and the same upper motor neuron dysfunction distribution as his previous deficits, "I would not be surprised if this represents a slow decline in neurological functioning related to his old transverse myelitis." *Id.*  MRIs showed abnormal ill-defined T2 and STIR hyperintense signal

---

[30] Petitioner's medical history contains information outside the matters of his claim. Only what is relevant to petitioner's lower extremity weakness and limitation will be discussed in this section, though the entirety of his medical record was considered in ruling on the issues discussed herein.

[31] Records associated with Dr. Kaplan's possible demyelinating condition in 2001, as contained in Dr. Kaplan's personal medical files, were not filed until after the initial hearing. *See* Pet. Ex. 19.

[32] Dr. Moray did not indicate that his understanding of TM onset had changed since 2001. *See* Supp. Tr. 13.

[33] Mrs. Kaplan testified during the Onset Hearing that she believed it was his left foot, not the right. She affirmed that he did not have problems with his right foot. Tr. 138.

within the cervical cord. The activity was questioned so a "contrast enhanced MRI imaging of the cervical cord to assess whether or not lesions enhance to suggest an active process" was recommended. Pet. Ex. 2 at 7-9. However, "there [were] no findings to explain the clinical history. Incidental findings described above." Pet. Ex. 2 at 15-17; *see* Pet. Ex. 12.

Dr. McNamara documented left foot drop with diminished muscle tone and strength in dorsiflexion eversion of the left lower extremity, and abnormal/paralytic gait and mobility on April 28, 2016. A previous history of TM of the cervical region was noted. Pet. Ex. 4 at 11; 13.

A VAERS report was completed by petitioner after he received his AFO and was recommended a WA.[34] Pet. Ex. 19 at 6-9. Of note, a handwritten narrative by Dr. Kaplan states,

> 7. 2-3 days after the [2001] flu vaccination I developed bilateral tingling of the hands and feet. It was more pronounced when flexing my neck. In past few years "L" leg lost muscle mass. I began tripping and falling which has worsened in (sic) past 6 months. Continued in next page… I have weakness in my "L" leg. I also have developed "L" foot drop and clonus of my "L" foot. I was fitted with an AFO on my "L" leg which helps some. The PT company suggests I try a stimulator which will make my foot raise as I walk…The condition has caught up to me over the years apparently…See previous VAERS report enclosed…*I have noted in past 2 years that my balance was not as good as usual but felt it was age related… My wife thinks I have been having problems walking & dragging my left foot for a year or 2 but it became much more noticeable after my last flu vaccine in October.*

Pet. Ex. 19 at 8-9 (later edits italicized).

Petitioner presented for physical therapy on December 19, 2016 and reported onset of left lower extremity weakness in November of 2015 as the result of "the flu shot." Ex. 7 at 6, 9. He reported using a muscle stimulator on the left for drop foot for about 2-3 months and an AFO for 6-8 months. *Id.* at 9. The record from petitioner's cardiology appointment in January of 2017 notes the same history of onset and flu shot. *See* Pet. Ex. 18 at 14.

At a March 2018 cardiology appointment, petitioner was noted to have persistent foot drop related to TM following flu shot of 2014.[35] Petitioner's mobility improved with a nerve stimulator. Pet. Ex 18 at 10.

On May 20, 2019, over a year after Dr. Kaplan filed his petition in this Program, petitioner returned to Dr. Moray for the first time since March 28, 2016. Dr. Moray wrote that petitioner sustained TM that he felt was related to flu vaccination going back about 20 years. He remained stable for many years, had a repeat flu vaccination "which precipitated a precipitous decline in his functioning…. He had MRIs performed which I personally reviewed in 2016. I did not feel that there was (sic) any new lesions." Pet. Ex. 17 at 2. "The diagnosis remains the same that being transverse myelitis precipitated by flu vaccination." *Id.*

---

[34] Petitioner completed the report after June of 2016, though also added edits at a later date, likely in November of 2016. *See* n. 11, n. 13.

[35] This date is an error, which petitioner confirmed during testimony.

## 2.  Witness Testimony

Dr. Kaplan asserts that he was in good health following the resolution of his paresthesia and pain in 2001 until his October 2015 flu shot. He testified to doing all the activities he always did. Tr. 12-13. Dr. Kaplan denied any issues with walking and did not recall falling as documented in the medical record on June 2, 2014. Tr. 37; *See* Pet. Ex. 1 at 1. He did recall falling at some point in 2011 but claimed it was because he looked at a very beautiful motorcycle next to him, hit an uneven sidewalk, and fell. He did not recall a fall in 2014 and did not agree to the record documenting a fall. *See* Pet. Ex. 7 at 35; Tr. 37-39. However, petitioner admitted to intermittent limping when fatigued prior to his October 2015 flu shot and did not remember when it started, though "it was nothing like it was after the last flu shot"—no one noticed it but him. Pet. Ex. 8 at 3; Tr. 36, 64. Dr. Kaplan then testified that he had no symptoms when Mr. and Mrs. Price stayed in his home in early November. Tr. 45.[36]

Dr. Kaplan claims that his limping and left leg weakness began the weekend of Mrs. Kaplan's high school reunion, November 7-8, 2015, "or slightly before," affirming onset of "significant left foot dragging then tripping" which was "not something that I had done before." Pet. Ex. 8 at 3; Tr. 30. He described a bit of limping, foot dragging, and some tripping the weekend of Mrs. Kaplan's high school reunion. Tr. 13, 30, 40. Thereafter, "the limping became much more noticeable to the point that people started asking him about it," including people in his office and his brother-in-law while they were out walking their dogs. Pet. Ex. 8 at 3; 40. Tr. 28-30, 46.

Dr. Kaplan made an appointment with Dr. Moray in March of 2016 after his wife "nagged [him] enough" because he really does not like doctors much. Pet. Ex. 8 at 3; Tr. 14, 27. He testified that he reported limping and dragging of his foot, as well as his receipt of a flu vaccine in October of 2015. He affirmed that Dr. Moray found left leg weakness with foot drop. Pet. Ex. 8 at 3; Tr. 16-18, 544-55. He denied having leg weakness in 2001, reporting a slow worsening strength over the past three to four years, or ever discussing "a slow decline in neurological functioning related to his old transverse myelitis" with Dr. Moray. Tr. 48. He agreed the March 28, 2016 record had no mention of the flu vaccine but stated "I know I talked to him about [the flu vaccine] at the visit." Tr. 49.

Mrs. Kaplan affirmed in the past few years she had noticed that he had started to have left foot dragging which she claimed did not cause any problems with his walking three or more miles a day though she only walked with him occasionally.[37] Pet. Ex. 9 at 2. At hearing, she could not recall exactly when she started noticing that "he had a limp or would kind of drag or scuff his foot" when he was tired, but it was before November and could have been before October of 2015. Tr. 116; 135-36.  She then corrected the medical record for June 2, 2014, stating it was his left foot that he limped with, not his right, adding she had also observed during one summer in the last three

---

[36] The Prices stayed at the Kaplan's home from the time they sold their house in October until November 3, 2015, four days before the reunion weekend of November 7, 2015. Petitioner affirmed that his limping could have started before the reunion but his limping apparently was not present during the Prices's stay.

[37] Appreciating that the subject vaccine was received in 2015 and the hearing was in 2019, Mrs. Kaplan's correction of the 2014 record for dragging of the left foot, the issue of onset in November 2015, and her testimony of Dr. Kaplan's limping prior to vaccination, confirms that Mrs. Kaplan's use of the phrased in the "past few years" references the timeframe prior to the October 2015 flu vaccine.

or four years that Dr. Kaplan's left leg was considerably smaller than his right leg. Tr. 138-39. Finally, she stated that prior to October 2015, she sometimes would "hear his toe rub on the floor from his shoes" when he limped. Tr. 143.

According to Mrs. Kaplan, Dr. Kaplan's foot dragging became more noticeable around November 7, 2015, which was her fiftieth high school reunion, when they stayed at her brother and sister in-law's house. Pet. Ex. 9 at 2; Tr. 120.  She recalled her brother mentioning Dr. Kaplan limping after a walk with their dogs. *Id.* Mrs. Kaplan affirmed petitioner's left foot dragging increased and he developed problems going up and down the stairs thereafter.  Pet. Ex. 9 at 3.  She then started "paying more attention to [Dr. Kaplan's] walking" and became more concerned when Dr. Kaplan had an increase in tripping. Tr. 121-123, 144.  "He never used to trip before, but then he started." Tr. 142. She stated that Mrs. Price asked why he was limping in February of 2016. Pet. Ex. 9 at 2; Tr. 124. At the end of the winter, she insisted he see Dr. Moray after he "actually tripped two times where he almost fell." Tr. 126; 144. He went to Dr. Moray in March of 2016. Pet. Ex. 9 at 3.

Mrs. Kaplan stated after seeing Dr. Moray, Dr. Kaplan "seemed somewhat relieved that [the flu shot] could be causing the symptoms that he had." Tr. 127. She affirmed that Dr. Moray said Dr. Kaplan had suffered another episode of TM in "about the same area as the initial episode that had occurred in 2001."[38] Pet. Ex. 9 at 3. Mrs. Kaplan testified that petitioner's condition continued to worsen since March of 2016 and he has fallen at home, at the beach, and walking in a public garden. *See* Tr. 128-29.

The Prices and Kaplans have been friends for over 20 years; Mrs. Price did not recall Dr. Kaplan having TM in 2001. She also did not notice anything different about Dr. Kaplan's physical condition when they stayed with the Kaplans at the beginning of November 2015. Tr. 80-82; 92-93; Pet. Ex. 10 at 2. They did not go on any walks with the Kaplans at that time. Tr. 88.

Mrs. Price affirmed that in February 2016, when the Kaplans came to Florida, she immediately noticed that Dr. Kaplan was limping and dragging his left foot.  Pet. Ex. 10 at 23. At the hearing she stated, "He limped in Florida… I did notice it once, yes".  Tr. 85.

Mr. Skowyra affirmed in November of 2015 petitioner was "walking funny, favoring his left foot and had a noticeable limp." Pet. Ex. 11 at 2.  At hearing, he stated while they were walking their dogs, "[H]e got ahead of me for a while, and I noticed he was favoring his left foot, and he had a noticeable limp in it." Mr. Skowyra did not mention the limp to Dr. Kaplan, only to Mrs. Kaplan. Tr. 97-99. Mr. Skowyra did not recall Dr. Kaplan limping when he saw him last at his granddaughter's christening, on July 26, 2015. Pet. Ex. 11 at 2.

### B.  Analysis of the Record

Dr. Kaplan's actions following the October 5, 2015 flu vaccine, the history he reported, the contents of the contemporaneous medical records, his testimony, and the testimony of witnesses do not support onset of a left leg condition in November of 2015 associated with his October 5, 2015 flu vaccine. Rather, the record as a whole supports a left leg condition which slowly

---

[38] There was no indication that Mrs. Kaplan was at the visit with Dr. Moray or when she learned of this information.

progressed over several years until March of 2016 when the severity of petitioner's condition precipitated the March 28, 2016 visit to Dr. Moray. Following March 28, 2016, petitioner then experienced significant and continued deterioration with development of a drop foot documented on April 28, 2016 requiring the use of an AFO and, eventually, a stimulator.

For the reasons set forth below, I find that petitioner's left leg symptoms began prior to his October 5, 2015 flu vaccination and continued with progressive weakness becoming more pronounced just prior to his March 28, 2016 appointment with Dr. Moray. Further, I find that petitioner's condition continued to rapidly decline following March of 2016 resulting in Dr. McNamara's finding of a left drop foot and decreased mobility on April 28, 2016.

### 1. Petitioner's Medical Record Indicates a Progressive Onset of Left Leg Symptoms that Began Prior to Petitioner's October 5, 2015 Vaccination

The medical record does not support a November 2015 onset. To find that petitioner did not experience left leg symptoms until November 2015, rather than experiencing a progressive onset of left leg symptoms, would require me to accept that petitioner ignored a sudden onset of new symptoms for five months despite limping, increased tripping, and dragging his foot. Furthermore, to accept petitioner's onset claim would require me to disregard Dr. Moray's March 28, 2016 record indicating progressive onset of three-to-four years and instead find the record to be incorrect and incomplete. In fact, petitioner's own statements in his VAERS report support a progressive onset over several years. The contemporary medical records, the records of Dr. Moray, clarified through his testimony, and petitioner's records in his personal file do not support petitioner's onset claim of November 2015.

#### i. Contemporaneous Medical Records Do Not Support Onset of Left Leg Symptoms Within a Month of Petitioner's October 5, 2015 Vaccination or by Early November 2015

Dr. Kaplan is historically detailed about his health when presenting for medical care. Overall, petitioner's medical records demonstrate that he regularly sought medical attention and relayed very specific information about the onset and duration of his symptoms where relevant. *See* Pet. Ex. 15 at 6 (petitioner presented with six weeks of back pain that progressed into his right leg); *see* Pet. Ex. 1 at 4 (petitioner presented with worsening chronic bipedal edema); *see* Pet. Ex. 1 at 1 (petitioner reported fatigue for the past 24 hours, a fall while walking, right foot-drag,[39] and bilateral neck pain for three to four days). Particularly relevant, when Dr. Kaplan presented to Dr. Moray within a month of his November 1, 2001 flu vaccination, he reported tingling in his extremities post-vaccination, with onset two-to-three days after vaccination. He also filled out a VAERS report on December 17, 2001. *See* Pet. Ex. 19 at 7, 11.

Following the October 5, 2016 flu vaccine however, petitioner did not present to a physician until March 28, 2016, nearly six months after vaccination and five months after his alleged onset of November 2015. He presented to Dr. Moray, whom he had not seen since December of 2001. Upon examination, Dr. Moray documented a limp, mildly spastic gait on the left, and weakness in petitioner's hip—no drop foot was noted. *See* Pet. Ex. 2 at 2. There is no

---

[39] Mrs. Kaplan affirmed that this would have been his left foot not right foot.

reference to the October 5, 2015 flu vaccine or complaints of any onset of symptoms in November of 2015 associated with that flu vaccine. Rather, Dr. Kaplan reported worsening strength in his left lower leg over the past three to four years. *See id.* Similarly, when Dr. Kaplan presented to Dr. McNamara a month later on April 28, 2016, he did not report the receipt of a flu vaccine in October of 2015 or onset of symptoms associated with that vaccine as beginning in November of 2015. However, Dr. McNamara's examination found a left foot drop, with abnormal gait and mobility, which was not present one month prior when petitioner saw Dr. Moray. Pet. Ex. 4 at 11. *See id.*

Petitioner's first report of the October 5, 2015 flu vaccine with an onset of symptoms associated with that vaccine was over a year later when Dr. Kaplan presented for medical care on December 19, 2016. At that visit he reported onset of left lower extremity weakness in November of 2015 caused by "the flu shot." Pet. Ex. 7 at 6, 9. At his next medical visit on January 26, 2017 with Dr. Yeh, Dr. Kaplan provided a similar history of TM following an October 2015 flu shot and development of drop foot requiring physical therapy and a nerve stimulator. Pet. Ex. 18 at 14.

Petitioner's personal file, filed after the hearing, provides insight, but not support, into his first report on December 19, 2016 of a flu vaccination on October 5, 2015 and onset of symptoms in November of 2015. *See* Pet. Ex. 19 at 140. Petitioner's personal file contains petitioner's VAERS report which was completed in 2016 and included a handwritten narrative by Dr. Kaplan which states: "In the past few years 'L' leg lost muscle mass. I began tripping and falling…The condition has caught up to me over the years apparently," and "I have noted in the past 2 years that my balance was not as good as usual." Pet. Ex. 19 at 8-9. Though petitioner wrote that his condition "worsened in [the] past 6 months," his narrative confirms a continuing process over several years and at best suggests a worsening of petitioner's already declining condition sometime in early 2016. *See id.* Petitioner's recital of his history in the handwritten narrative confirms onset of petitioner's left leg weakness and difficulty walking prior to the October 2015 flu vaccination and is contrary to his testimony that he had no left leg weakness prior to his October 2015 vaccination or November 2015 onset. Further, it corroborates petitioner's June 2, 2014 record documenting Mrs. Kaplan's concerns of foot drag[40] and a fall while walking, providing further proof that petitioner was experiencing ongoing difficulty walking by 2014. Pet. Ex. 4 at 1. It also supports Dr. Moray's March 28, 2016 record of worsening strength over three-to-four years and a "slow decline." Pet. Ex. 2 at 2.

Also contained in his personal file was an October 28, 2016 email exchange between Dr. Kaplan and a well-known expert for petitioners in the Vaccine Program. The email exchange resulted in a telephone call between the two, with a follow-up email providing Dr. Kaplan with recommendations of attorneys that practice in the Vaccine Program. *See* Pet. Ex. 19 at 16-18. Dr. Kaplan's first report to a medical provider of an October 5, 2015 flu vaccine with onset of symptoms in November of 2015, at his December 19, 2016 appointment, came on the heels of this telephone conversation.

While it is not unusual for petitioners to delay treatment of an injury or not associate an injury with a vaccine received until sometime later, this case does not lend itself to that explanation.

---

[40] Though the record indicated that Mrs. Kaplan reported right foot drag, testimony from Mrs. Kaplan, petitioner's own statements in the VAERS report, and the March 28, 2016 record indicating no right leg weakness, the record is likely incorrect. *See* n. 26 and n. 33 discussing Tr. 138; Pet. Ex. 2 at 2.

When Dr. Kaplan believed that he suffered transverse myelitis following a 2001 flu vaccine, he promptly presented for medical care reporting his receipt of the flu vaccine with onset of symptoms with specificity. *See* Pet. Ex. 19 at 7, 11. Here, petitioner did not seek treatment for five months after his alleged onset of symptoms, and when he did present on March 28, 2016 to Dr. Moray, with whom he had treated in 2001, he made no mention of the flu vaccine or onset of symptoms but rather reported a three-to-four years of worsening of symptoms. It is not believable that Dr. Kaplan would fail to accurately report his condition on March 28, 2016. Petitioner's handwritten VAERS responses confirm that he had problems for a couple years prior to his vaccination and is consistent with his report to Dr. Moray on March 28, 2016.

Indeed, speaking to an experienced expert in the Program and/or obtaining counsel prior to reporting receipt of a vaccine and alleged onset of symptoms to any medical provider does not automatically discount a petitioner's claims, but it does bring into question how much weight should be afforded to the reports of a vaccine-related onset of injuries over a year later. *See* Pet. Ex. 7 at 6; *see* Pet. Ex. 18 at 14. Unlike the March 28, 2016 and April 28, 2016 medical records, the reports to medical providers of an October 5, 2015 flu vaccine and onset of symptoms in November of 2015, are statements made after the fact, with knowledge of the Vaccine Program and potentially in preparation for litigation—such statements are not as reliable. These after-the-fact statements, which appeared for the very first time in December 2016 and January 2017, are not persuasive and are accorded much less evidentiary weight. *Vergara v. Sec'y of Health & Hum. Servs.*, No. 08-882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories, affidavits, or trial testimony."); *see also Cucuras* at 1528 (Fed. Cir. 1993) (crediting medical record evidence over a petitioner's contradictory testimony). Petitioner's report to Dr. Moray on March 28, 2016 of a three-to-four-year history of progressive left leg weakness when seeking treatment for such symptoms carries significantly more weight than the records over a year later.

The contemporaneous records in March and April of 2016, when petitioner first sought care for increased decline of his progressing left leg weakness, in conjunction with petitioner's personal file containing writings in his own hand, support a gradual onset of left leg symptoms over a three-to-four-year period prior to his receipt of the October 5, 2015 flu vaccine. Petitioner's condition continued to rapidly decline following March of 2016 resulting in Dr. McNamara's finding of a left drop foot and decreased mobility on April 28, 2016.

### ii. Dr. Moray's 2017 Letter Conflicts with the Medical Record and, Taken Altogether with Dr. Moray's Testimony, Does Not Support Petitioner's Onset Claim of November 2015

Dr. Moray's March 28, 2016 office record contradicts his February 2, 2017 letter, which was requested by petitioner, as well as his record for petitioner's May 20, 2019 visit. Dr. Moray's testimony on January 29, 2020 was consistent with his March 28, 2016 record, is afforded more weight, and supports a progressive onset of three-to-four years before March 2016.

On March 28, 2016, Dr. Moray documented limping, mildly spastic gait on the left, and slight increased tone in petitioner's lower left extremity, with falling two years prior and worsening

strength in petitioner's lower leg over the past three-to-four years. Pet. Ex. 2 at 2. Dr. Moray further wrote he "would not be surprised if this represents a slow decline in neurological functioning related to his old transverse myelitis." *Id.* at 2-3. There was no record of a flu vaccine, any specific onset of symptoms or any discussion of significant changes in his condition in the recent months documented in that record. The MRIs ordered showed abnormal ill-defined T2 and STIR hyperintense signal within the cervical cord. There was a question as to whether the lesions enhanced to show active process. Pet. Ex. 2 at 7-9; *see* Pet. Ex. 13. However, there were "no findings to explain the clinical history. Incidental findings described above." Pet. Ex. 2 at 15-17; *see* Pet. Ex. 12. There is no mention of petitioner having suffered another TM attack, a vaccine reaction, or that petitioner's MRIs were related to petitioner's declining condition.

On January 27, 2017, Dr. Kaplan contacted Dr. Moray, requested Dr. Moray write a letter and provided information to be included in that letter. [41] Dr. Moray documented in his file that he would write a letter summarizing "clinical information which she (sic) has given me today." Pet. Ex. 21 at 3. The information provided included "a flu vaccine in October 2015" and "[w]ithin a month after receiving the vaccine the patient began to have increasing stiffness and incoordination of the left leg." *Id.* This phone call was the first time Dr. Moray learned of the October 2015 flu vaccine and petitioner's onset of left leg problems within one month the vaccination.

Dr. Moray then authored a letter dated February 2, 2017, which contradicted his March 28, 2016 medical record and contained information not present in the March 28, 2016 record. Pet. Ex. 2 at 1. Dr. Moray wrote of Dr. Kaplan's 2001 history of cervical TM, which was reported shortly after a flu shot, that he evaluated petitioner at that time, and that petitioner had a complete recovery. *Id.* He then wrote that at the March 28, 2016 appointment, Dr. Kaplan reported weakness, mostly in the left leg interfering with his gait, having suffered a fall related to this, and receipt of a flu vaccine in October of 2015, "for which one month later his gait significantly worsened." *Id.* Dr. Moray added, "I unfortunately did not see him until March 2016, which was about five months since the vaccination." *Id.* Dr. Moray wrote that his examination revealed spastic gait on the left and slowing of fast foot motions. MRI of the cervical spine on April 7, 2016 showed faint change on T2 imaging in the cervical cord at C2, more prominent on the right. A second area at the medullary cervical junction was noted as well. Slight cord atrophy consistent with an old lesion was noted, though the timing of the lesion was unknown. *Id.* The letter concluded that Dr. Moray's diagnosis was TM perhaps exacerbated by repeat flu vaccination in October of 2015 but he could offer only symptomatic treatment and to avoid further flu vaccines. *Id.*

In his record for petitioner's May 20, 2019 appointment, Dr. Moray wrote that petitioner sustained TM that petitioner felt was related to flu vaccination going back about 20 years. He remained stable for many years, had a repeat flu vaccination "which precipitated a precipitous decline in his functioning." Pet. Ex. 17 at 2. "The diagnosis remains the same that being transverse myelitis precipitated by flu vaccination." *Id.*

Dr. Moray's testimony on January 29, 2020, however, does not support his February 2, 2017 letter or his May 20, 2019 medical record, nor does it support petitioner's claim of onset in

---

[41] Records of petitioner's phone conversation with Dr. Moray on January 27, 2017 were not filed until after the Onset Hearing on August 6, 2019.

November of 2015 following his October 5, 2015 flu vaccine.[42] Dr. Moray was adamant during his testimony that he was unaware of the October 2015 flu vaccine and that Kaplan reported three-to-four years of worsening left leg symptoms when he saw Dr. Kaplan on March 28, 2016—"in 2016, I believe [Dr. Kaplan] did not mention the flu vaccine relationship at that time." Supp. Tr. 16; 21; 36. On cross examination, he again stated, "I do not remember the flu vaccine issue coming up at all during that visit." Supp. Tr. 35. He also confirmed several times that on March 28, 2016, Dr. Kaplan reported "worsening weakness of his leg" that began "three or four years prior to the 2016 office visit." Supp. Tr. 14; 24, 35.

Dr. Moray further testified that his assessment on March 28, 2016 was that petitioner's symptoms likely represented "a slow decline in neurological functioning related to his old transverse myelitis." Pet. Ex. 2 at 3. Dr. Moray added that petitioner's 2016 cervical MRI did not show a new lesion, which is why he found that the MRI was consistent petitioner's old transverse myelitis. Supp. Tr. 41. Dr. Moray explained that though the 2016 cervical MRI seemed to show an additional lesion not seen in the 2001 imaging, "newer technology may have identified an abnormality that could not be seen on the original study." Supp. Tr. 18. He confirmed that when he reviewed the imaging, he "did not feel that there [were] any new lesions" and was unaware of any way to determine whether one lesion is older than another." Supp. Tr. 27. Dr. Moray confirmed that his statement in the March 28, 2016 record, "I would not be surprised if this represents a slow decline in neurological functioning related to his old transverse myelitis," reflected his opinions on that date. *See* Supp. Tr. 15-16.

When pressed about the content of the February 2, 2017 letter, Dr. Moray could not explain how he attributed Dr. Kaplan's worsening symptoms to the October 2015 vaccination, since there was no reference to the vaccine or onset in his March 28, 2016 medical record. While he could not recall when he learned about the vaccine, he admitted that it must have been between March 2016 and February 2017 when he wrote the February 2, 2017 letter. Supp. Tr. 22-23. Dr. Moray eventually admitted the reason for the conflicting records: "I can only say…I got this history from the patient and this is what the patient told me." Supp. Tr. 25; *see also* Supp. Tr. 40. He further testified that, based on what Dr. Kaplan told him, he wrote the diagnosis was "transverse myelitis, perhaps exacerbated by repeat flu vaccination in October 2015" because "it just seemed that [the flu vaccines] may have been precipitating or worsening his neurological dysfunction based on his history." Supp. Tr. 20.

Referencing the May 20, 2019 office record, Dr. Moray stated he did not know what year or flu vaccine petitioner was referring when he documented that petitioner's transverse myelitis was precipitated by the flu vaccination. Like the February 2, 2017 letter, the May 20, 2019 record was "based strictly on the history" Dr. Kaplan provided. Supp. Tr. 30-31; 50. He confirmed again that as the May 2019 record reflects, he did not find any new lesions in petitioner's 2016 MRIs. Supp. Tr. 41.

---

[42] At the time of the Onset Hearing, there was no explanation for the differences between Dr. Moray's March 28, 2016 record and February 2, 2017 letter. The record of petitioner's phone conversation with Dr. Moray was not filed until after the August 6, 2019 Onset Hearing. Because of the discrepancies—such as the March 28, 2016 record never mentioning petitioner's flu vaccine or exacerbation of transverse myelitis in relation to petitioner's flu vaccine—Dr. Moray was called upon to testify in the matter to clarify the information in his records.

Considering the above, Dr. Moray's testimony is evidence that the most reliable report of onset in a medical record is contained in the March 28, 2016 record. The February 2, 2017 letter bears little value as it was drafted at the insistence of Dr. Kaplan with information provided to Dr. Moray after the fact and not for treatment purposes. In fact, the letter was requested after petitioner learned of the Vaccine Program and had been advised of attorneys in the Program. *See Gerami v. Sec'y of Health & Hum. Servs.*, No. 12-442V, 127 Fed. Cl. 299 (2014), *denying mot. for rev.* 2013 WL 5998109 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding the special master properly afforded petitioner's contemporaneous records more weight than a letter from a treating physician written for the purposes of litigation). Dr. Moray admitted that he relied solely on Dr. Kaplan's statements made during the phone call on January 27, 2017 and failed to consult his prior records in writing his February 2, 2017 letter. *See* Supp. Tr. 25, 40. Contrary to petitioner's testimony, Dr. Moray never diagnosed petitioner with transverse myelitis caused by petitioner's October 2015 vaccination, nor did the MRI support it. *See* Supp. Tr. 20, 27, 30-31, 50. Dr. Moray consistently and affirmatively reported that petitioner reported a progression of leg weakness over three-to-four years and that petitioner did not report a flu vaccine or relate his onset of left leg symptoms to any flu vaccine when seeking treatment in March of 2016. *See* Supp. Tr. 14; 24, 35. Further, Dr. Moray's May 20, 2019 record associating Dr. Kaplan's left leg condition to a flu vaccine bears almost no value as to onset. The record is a repetition of petitioner's onset narrative, created almost four years after the alleged onset, and made after petitioner filed his claim in the Program. *See* Pet. Ex. 17 at 2.

Based on the weight of the contemporaneous March 28, 2016 record over the February 2, 2017 letter and the May 20, 2019 record, which were made in reliance of petitioner's statements and not for treatment purposes, there is no reliable support in the contemporaneous medical records for Dr. Kaplan's onset claim of November 2015 following his flu vaccination. *See Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1346–49 (Fed. Cir. 2010) (affirming the special master's holding in which he found a contemporaneous medical record more persuasive than post-hospitalization notes, where the doctors who wrote the post-hospitalization notes "did not provide reasoning for their statements"). Rather, petitioner's medical records prior to and including March 28, 2016, as well as his own handwritten history, support that petitioner's left leg symptoms began prior to his October 5, 2015 flu vaccination, with onset of progressive weakness several years before his March 28, 2016 appointment.

## 2. The Witness Testimony Given Does Not Provide Consistent, Clear, Cogent, or Compelling Support for Petitioner's Onset Claim of November 2015[43]

The contemporaneous medical records do not support petitioner's onset claim and neither does the testimony provided in this matter. The testimony of the witnesses is not so compelling, consistent, or clear to overcome the weight of the contemporaneous records documenting a three-to-four-year onset with slow decline. This is not to say that the witnesses who testified on behalf of Dr. Kaplan were dishonest, but rather that, with the exception of Mrs. Kaplan, the supporting testimony consisted only of a few observances under limited circumstances. Additionally,

---

[43] Dr. Moray's testimony is not addressed in this section as it only pertained to his records and not his own personal knowledge of petitioner during the time of petitioner's alleged onset. Dr. Moray's testimony is fully addressed in the section above, Section (IV)(B)(1)(ii).

petitioner's own testimony was inconsistent with the records and, at times, inconsistent with other witnesses' testimony.

### i. Dr. Kaplan's Testimony Does Not Provide Credible Support for His Onset Claim

Dr. Kaplan's testimony is largely refuted by the records and inconsistent with that of other witnesses. The significant contradictions between petitioner's statements and the records, and between petitioner's statement and the testimony of other witnesses, detracts from petitioner's credibility. Overall, petitioner's testimony does not provide credible support for his onset claim. *Reusser v. Sec'y of Health & Human Servs*., 28 Fed. Cl. 516, 523 (1993) (finding statements offered after the events in question less reliable than earlier contemporaneous records, stating, "Written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later."); *see also Cucuras* at 1528 (Fed. Cir. 1993) (crediting medical record evidence over a petitioner's contradictory testimony).

Dr. Kaplan testified that he reported his October 2015 flu vaccination and an onset of symptoms within a month of his vaccination to Dr. Moray on March 28, 2016. Tr. 17; 54-55. He also testified that he reported his limp and foot drag at the March 2016 appointment and claimed that Dr. Moray found left leg weakness and foot drop on examination. Pet. Ex. 8 at 3; Tr. 16-17. He acknowledged that no record mentions his foot drop until April 28, 2016 but was adamant that his foot drop was already present at his March 28, 2016 visit. Tr. 67-68. Dr. Kaplan denied reporting a three-to-four-year history of progressively worsening left leg strength and suggested that, if such was documented in the record, it was an error in Dr. Moray's record-keeping. *See* Tr. 39, 40, 67.

However, petitioner's testimony is contradicted by the medical record and Dr. Moray's testimony. None of what petitioner testified to reporting on March 28, 2016 was documented in the March 2016 record. Dr. Moray was adamant that petitioner never reported the flu vaccination during the March 2016 appointment and that he did not learn of petitioner's October 2015 flu vaccination until he wrote the February 2, 2017 letter. Supp. Tr. 16, 21-23, 35-36. Dr. Moray also testified to and documented petitioner's report of a three-to-four-year onset with slow decline, and he denied any knowledge of petitioner's October 2015 flu vaccine or November 2015 onset of symptoms. Pet. Ex. 2 at 2; Supp. Tr. 14; 24, 35. Lending credibility to Dr. Moray's testimony is the summary of the January 27, 2017 phone call between Dr. Moray and petitioner, which suggests that the October 2015 vaccination and report of onset of stiffness and incoordination one month thereafter were reported to Dr. Moray for the first time during the January 27, 2017 phone call. *See* Pet. Ex. 21 at 3. And as discussed above, the February 2, 2017 letter is not a reliable piece of evidence to support petitioner's onset claim. *See Gerami v. Sec'y of Health & Hum. Servs.*, No. 12-442V, 127 Fed. Cl. 299 (2014), *denying mot. for rev.* 2013 WL 5998109 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding the special master properly afforded petitioner's contemporaneous records more weight than a letter from a treating physician written for the purposes of litigation). Therefore, Dr. Moray's office record of March 28, 2016 and testimony of the events is more reliable than the testimony and affirmations of Dr. Kaplan.

Portions of petitioner's testimony also contradict that of his wife, brother-in-law, and his own prior statements. Dr. Kaplan testified that he never had issues with left leg weakness or with walking until his receipt of the October 2015 flu shot. Tr. 33-35. He disagreed with the June 2, 2014 record documenting foot drag and did not recall the fall reported at the appointment. Tr. 37, 64. However, Mrs. Kaplan testified that petitioner had issues with left foot dragging and limping prior to October of 2015, dating back at least to 2014. *See* Tr. 138-39, 143. Petitioner himself wrote in 2016 in his VAERS report that his left leg had lost muscle over the years, his condition caught up to him over the years, and he had specifically noticed trouble with balancing in the two years leading up to 2016. *See* Pet. Ex. 19 at 8-9. According to petitioner's brother-in-law, Mr. Skowyra, while he noticed Dr. Kaplan's limp during their walk in November of 2015, he did not want to embarrass petitioner and therefore did not ask or mention the limp to petitioner; instead, he mentioned it to his sister, Mrs. Kaplan. Tr. 98. However, Dr. Kaplan testified that Mr. Skowyra asked him about the limp. Tr. 46. While individual's memories of events may differ and fade over time, Dr. Kaplan's recounting of events seem to construct a narrative most favorable to his claims in this case that are not consistent with his condition prior to his October 2015 vaccination.

Dr. Kaplan attempted to explain his failure to consult a physician for five months after the onset of symptoms he associated with his October 2015 flu vaccine, *see* Tr. 27, but his medical records reflect someone who seeks treatment promptly and reports a detailed history, reasons for his visits, and onset of symptoms with specificity. *See* Section (IV)(B)(1)(i). When considering Dr. Kaplan's actions following his 2001 flu vaccine—his presentation for medical care, the specificity with which he reported his onset of symptoms, and his preparation of a VAERS report due to his belief his symptoms were vaccine related—it is difficult to accept that he would wait for over five months before seeking care after his 2015 flu vaccine if he had a sudden onset or substantial increase of limping, dragging his left foot, or tripping. Petitioner's testimony of reasons for failing to seek medical treatment is belied by his actions in seeking care historically.

It is further difficult to accept that when petitioner finally presented on March 28, 2016, to the same physician who evaluated him after his 2001 flu vaccine, he would fail to report either his flu vaccine or an onset of significant symptoms in November of 2015, if there was indeed a change temporally associated with the receipt of his flu vaccination. It is even more difficult to accept that petitioner would instead report worsening strength in the left leg for the past three-to-four years if it were not accurate. Even if I were to accept that Dr. Kaplan reported his vaccination and told Dr. Moray it was three-to-four months, not years, it would not explain why Dr. Moray wrote "slow decline" if it were a quick onset over the course of a few months. It also would not explain why, when petitioner presented to Dr. McNamara one month later and had developed foot drop, he would also fail to mention the flu vaccine or the onset of symptoms in November of 2015. Recognizing that treating physicians may omit certain details in their records, it is hard to fathom that two of petitioner's treating doctors would separately fail to and/or incorrectly document his presenting history and onset of symptoms, particularly in light of petitioner's prior history of transverse myelitis that petitioner associated with a prior flu vaccination.

Petitioner's personal testimony overall is not credible, and is not so consistent, clear, cogent, or compelling to support his onset claim of November 2015.

### ii. Mrs. Kaplan's Testimony Supports a Progressive Onset Over Several Years

Mrs. Kaplan attempted to support Dr. Kaplan's claims; however, her testimony was generally more credible than that of Dr. Kaplan's and ultimately supported a progressive onset over several years of left leg symptoms.

Mrs. Kaplan testified that her brother mentioned petitioner's limp to her on November 7, 2015, her reunion weekend. Pet. Ex. 9 at 2; Tr. 120. She began paying greater attention to petitioner's condition and when he started tripping, which he had not done before, she became concerned. Tr. 121-124; 142; 144. She also testified that a family friend, Mrs. Price, noticed "the limping during a walk in February of 2016 and mentioned it." Pet. Ex. 9 at 2; Tr. 124. Mrs. Kaplan testified that petitioner's condition was so severe towards the end of winter that she insisted he see Dr. Moray after he "actually tripped two times where he almost fell." Tr. 126; 144.

Mrs. Kaplan attempted to support petitioner's claim that he reported the October 2015 flu vaccine and onset of symptoms to Dr. Moray at his visit on March 28, 2016 by stating that Dr. Kaplan seemed relieved after seeing Dr. Moray because he was told his symptoms were potentially caused by the flu vaccination. *See* Tr. 127. Mrs. Kaplan further stated Dr. Moray told Dr. Kaplan at the March 28, 2016 visit that Dr. Kaplan likely suffered TM again in about the same area as in 2001. Pet. Ex. 9 at 3. Mrs. Kaplan testified that Dr. Kaplan's condition has continued to worsen since March of 2016. Tr. 128-129.

While Mrs. Kaplan expectedly tried to support her husband's claims, she also candidly testified and affirmed that Dr. Kaplan had been limping and dragging his left foot when tired for several years, prior to November or October 2015. She specifically recalled hearing petitioner's left toe rub on the ground. Pet. Ex. 9 at 2; Tr. 116, 143. Mrs. Kaplan even sought to correct a June 2, 2014 medical record to more accurately reflect that it was his left foot, not right foot, that she observed him dragging in 2014. Tr. 138. She further provided her observation that his left leg was thinner than his right leg a few summers before October of 2015. Tr. 138-139.[44] Though Mrs. Kaplan attempted to support petitioner's claim's that he had reported the vaccination at his March 28, 2016 visit and that Dr. Moray had assessed his condition to be related to the flu vaccination, Mrs. Kaplan was not with Dr. Kaplan at that visit. It is unknown when this information was relayed to Mrs. Kaplan. *See* Tr. 127. Further, Dr. Kaplan's statements about what he reported and discussed with Dr. Moray, as detailed in the prior section, are not supported by the record or Dr. Moray's testimony. *See* (IV)(B)(2)(i).

Ultimately Mrs. Kaplan's affidavit and testimony do not support an onset of left leg symptoms in November of 2015 but rather a progressive decline from at least 2014, culminating in symptoms severe enough towards the end of winter 2015-16 and shortly before March 28, 2016 for her to implore petitioner to see Dr. Moray. *See* Tr. 126, 144. While Mrs. Kaplan may have noticed petitioner's limp more frequently after her brother pointed it out in November 2015, her testimony indicates that petitioner's condition predated the October 2015 vaccination. *See* Pet. Ex. 9 at 2; Tr. 116, 138, 143. Further, her testimony supports that petitioner's condition continued to

---

[44] This seems to be corroborated by petitioner's own writing in his VAERS report that his left leg loss muscle mass over the years. Pet. Ex. 19 at 8.

decline more noticeably at the end of the winter of 2016 and then rapidly declined after petitioner's visit with Dr. Moray in March of 2016. *See* Tr. 124, 126, 142-44. Mrs. Kaplan's candid testimony, along petitioner's medical, personal record, and Dr. Moray's testimony, establish that petitioner indeed had troubles with his gait, due to his left leg, prior to his October 2015 vaccination.

Mrs. Kaplan's testimony does not support petitioner's onset claim of November 2015 or onset within a month of his October 2015 vaccination.

### iii.   Mr. Skowyra and Mrs. Price's Testimony Are Unsupportive of Petitioner's Onset Claim

The testimony of Mr. Skowyra and Mrs. Price are neutral at best and do not provide particularly compelling support for petitioner's onset claim. Mrs. Price testified that she did not notice anything unusual about Dr. Kaplan in early November 2015 but noticed him limping and dragging his left foot in February of 2016 as the two families walked home together from dinner. *See* Pet. Ex. 10 at 2-3; Tr. 85. Mr. Skowyra, however, testified that he noticed petitioner's limp in November of 2015 when petitioner walked ahead of him during a walk with their dogs and mentioned it to Mrs. Kaplan. Tr. 97-98. He recalled it was the weekend of November 7, 2015 as the Kaplans stayed with him over the weekend of Mrs. Kaplan's fiftieth high school reunion in November of 2015. *See id.* Mr. Skowyra testified that he did not see petitioner walking with a limp at his granddaughter's christening in July of 2015. Pet. Ex. 11 at 2.

There is no reason to doubt that Mr. Skowyra observed Dr. Kaplan limping while out walking their dogs together in November of 2015. While this observation could support a November 2015 onset, this observation is also consistent with a progressive onset over several years and Mrs. Kaplan's testimony that petitioner limped at times, particularly when tired, prior to October 2015. Additionally, the value of Mr. Skowyra's observation is limited as it is constrained to a specific circumstance and activity. Mr. Skowyra did not state that Dr. Kaplan limped the entire walk with their dogs but rather that he noticed it at some point when Dr. Kaplan was in front of him. He did not qualify whether the limp he observed was subtle or profound or if there was foot drag. Mr. Skowyra also did not say he observed petitioner limping continuously throughout the weekend or at any other points of the weekend. Thus, Mr. Skowyra's testimony is limited to a general observation during a walk in November of 2015. Additionally, Mr. Skowyra's testimony that he did not observe petitioner having a limp in July of 2015, at his granddaughter's christening, is simply that. At best, this testimony establishes that Mr. Skowyra did not observe petitioner limping during the specific time and activities of his granddaughter's christening; it is not proof that petitioner did not limp periodically, limp during walks or other activities, or have a limp at all in July of 2015.

There is also no reason to doubt that Mrs. Price observed petitioner's limp and foot drag in February of 2016 during a walk home from dinner. However, Mrs. Price's observance in February of 2016 does not provide support for petitioner's claimed onset of November 2015. Instead, Mrs. Price's testimony would be consistent with Mrs. Kaplan's testimony that petitioner's left leg symptoms became more problematic towards the end of winter 2015-16. Additionally, Mrs. Price affirmed that she did not notice anything out of the ordinary when she stayed with the Kaplans in early November 2015. Mrs. Price's failure to notice a limp while residing in Dr. Kaplan's home in

November 2015, while Mr. Skowyra noticed a limp during a walk and Mrs. Kaplan noted petitioner's limping at times, confirms that petitioner's limp was likely associated with specific activities and supports a gradual decline over several years.

The testimony given by Mrs. Price and Mr. Skowyra fails to provide consistent, clear, cogent, or compelling evidence to support petitioner's alleged onset in November of 2015.

In sum, the testimony offered in this matter fails to support petitioner's claim of onset of symptoms in November of 2015 or within a month of his October 5, 2015 flu vaccine. Rather, Mrs. Kaplan's testimony supports a progression over several years, and Mrs. Price and Mr. Skowyra's testimony suggest periodic limping prior to March of 2016, consistent with a gradual and continued decline. The testimony given in this matter largely affirms the medical records documenting a three-to-four-year progression of weakness in his left leg manifesting as limping, dragging, and tripping that worsened by the end winter 2015-16 or March of 2016, with continued debility thereafter. I find that petitioner's left leg symptoms began prior to his October 5, 2015 flu vaccination with continued progressive weakness for several years which became more pronounced just prior to his March 28, 2016 medical appointment with Dr. Moray. Petitioner then experienced rapid decline with development of a drop foot and decreased mobility documented by Dr. McNamara on April 28, 2016 requiring an AFO and stimulator thereafter.

### 3. Petitioner's Condition Significantly Deteriorated Following March of 2016

While petitioner's left leg symptoms began prior to his October 2015 vaccination, there is a well-documented difference in petitioner's condition between March 28, 2016 and April 28, 2016 and further debility thereafter.

On March 28, 2016, Dr. Kaplan presented to Dr. Moray with a limp, his gait mildly spastic on the left. Pet. Ex. 2 at 2. Dr. Moray documented a slight increased tone in left leg and some weakness in the hip joint. *Id.* There was no foot drop noted and gait was only mildly spastic. However, by April 28, 2016, petitioner presented to Dr. McNamara with left foot drop, diminished muscle tone and strength in dorsiflexion eversion of the left lower extremity, and abnormal/paralytic gait and mobility. Pet. Ex. 4 at 11. Dr. Kaplan then required a left AFO for stability at the end of May of 2016 and eventually a stimulator in September of 2016. Pet. Ex. 6 at 15; 19; 24-24; 26-27; 26-27. Dr. Kaplan and Mrs. Kaplan also testified to petitioner's condition continuing to worsen since 2016. Petitioner fell several times after that, at home, at a beach, and in a public garden. *See* Tr. 128-29.

Based on the testimony and record, petitioner's function declined rapidly after March 28, 2016, with development of a drop foot by April 28, 2016 and decreased mobility requiring an AFO and stimulator shortly thereafter.

### V.   CONCLUSION

Upon detailed review of the record in its entirety and the testimony provided, the undersigned finds that petitioner suffered from progressive left leg symptoms that began prior to his October 5, 2015 flu vaccination and became more pronounced just prior to his March 28, 2016

appointment with Dr. Moray. Thereafter, Dr. Kaplan's condition rapidly declined resulting in drop foot by April 28, 2016, which required an AFO by the end of May of 2016 and eventually a stimulator in September of 2016.

A status conference will be held within thirty (30) days of the issuance of this ruling to discuss how the matter should proceed. The parties shall file a status report within fifteen (15) days, advising of a mutually agreeable morning to hold the status conference: May 23, May 25, May 27, or May 31, 2022.

Accordingly, the following is ORDERED:

> **By no later than <u>Friday, May 13, 2022,</u> the parties shall file a status report advising of a mutually agreeable date for a status conference— the morning of: May 23, May 25, May 27, or May 31, 2022. Or, if petitioner wishes to dismiss his claim, petitioner shall file a motion to dismiss.**

**IT IS SO ORDERED.**

<u>**s/Mindy Michaels Roth**</u>
Mindy Michaels Roth
Special Master
